# In the Iowa Supreme Court

---

No. 25–0443

Submitted March 24, 2026—Filed June 30, 2026

---

**State of Iowa,** ex rel. **Iowa Department of Natural Resources,**

Appellee,

vs.

**Donald Lilly** and **Ronald Albrecht,**

Appellants.

---

Appeal from the Iowa District Court for Jasper County, Brad McCall, judge.

Corporate officers appeal a district court ruling denying their motion to dismiss for lack of personal jurisdiction. **Affirmed in Part, Reversed in Part, and Case Remanded.**

Oxley, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, Mansfield, and McDermott, JJ., joined. May, J., filed an opinion concurring in the judgment, in which McDonald, J., joined.

Bradley R. Kruse (argued) and Joseph M. Borg of Dickinson, Bradshaw, Fowler & Hagen, P.C., Des Moines, for appellants.

Brenna Bird, Attorney General; Eric Wessan, Solicitor General; Breanne A. Stoltze (argued), Assistant Solicitor General; and Jacob J. Larson and David S. Steward, Assistant Attorneys General, for appellee.

**Oxley, Justice.**

The State alleges that two fiberglass waste recycling companies failed to properly dispose of roughly 1,300 decommissioned wind turbine blades, instead stockpiling the blades at sites across Iowa for years without recycling them.[1] The State now seeks civil penalties and a permanent injunction under Iowa's solid waste and recycling statutes. *See* Iowa Code § 455B.307 (2024); *id.* § 455D.4A. It sued not only the business entities, but also two of their corporate officers.

The businesses answered the State's petition, disputing its merits. The officers filed a joint motion to dismiss for lack of personal jurisdiction. The officers' motion argued that they had never been to Iowa and were not personally involved in the underlying action. The district court denied their motion, concluding that the officers had sufficient minimum contacts to be subject to personal jurisdiction in Iowa as responsible corporate officers of the two entities that were directly involved in the underlying conduct. It also ruled that each of the corporate officers may be subject to civil penalties as "[a]ny person who violates" Iowa Code section 455B.307. *Id.* § 455B.307(3).

This interlocutory appeal asks us to review those determinations. For the reasons below, we agree with the district court that the State has adequately pleaded that both officers are "person[s]" who could be subject to liability under Iowa Code section 455B.307(3). But we affirm in part and reverse in part as to the district court's exercise of personal jurisdiction over the corporate officers.

---

[1]The State made the same allegations against three other companies: GFS Trust Holdings, LLC; GFS Holding Group, LLC; and GFSI-MHE Manufacturing of Texas, LLC. The district court granted those entities' motion to dismiss for lack of personal jurisdiction, and the State did not include that ruling in this interlocutory appeal.

**I. Regulatory Background.**

Chapter 455B governs the jurisdiction of the Iowa Department of Natural Resources (DNR). Part of the chapter creates a detailed system for solid waste disposal. The general assembly enacted a policy declaration that protecting the environment and Iowans' health, safety, and welfare "require[s] the safe and sanitary disposal of solid wastes." *Id.* § 455B.301A(1). The general assembly thus sought to "protect[] the environment and the public" through "[a]n effective and efficient solid waste disposal program." *Id.*

Solid waste is "garbage, refuse, rubbish, and other similar discarded solid or semisolid materials." *Id.* § 455B.301(29). That definition includes "materials resulting from industrial, commercial, agricultural, and domestic activities." *Id.* Section 455B.307 places limits on where parties can dispose of solid waste:

> A private agency or public agency shall not dump or deposit or permit the dumping or depositing of any solid waste at any place other than a sanitary disposal project approved by the director unless the agency has been granted a permit by the department which allows the dumping or depositing of solid waste on land owned or leased by the agency.

*Id.* § 455B.307(1). The statute also directs the DNR to adopt rules regulating solid waste disposal to ensure "that the public interest is best served." *Id.*; *accord* Iowa Admin. Code r. 567—100.4 (regulating the "[g]eneral conditions of solid waste disposal"). The director of the DNR "may issue any order necessary to secure compliance with or prevent a violation of" section 455B.307 or DNR rules on solid waste disposal. Iowa Code § 455B.307(2).

Chapter 455D governs waste volume reduction and recycling. The general assembly made statutory findings that "Iowa's environment is precious and no person has the right to pollute Iowa's air, water, or soil." *Id.* § 455D.2(1); *see also id.* § 455D.4 (establishing "[w]aste volume reduction policies"). And because

"[t]he environment is vulnerable and irreplaceable," chapter 455D institutes "an ongoing responsibility to conserve, preserve, and enhance the state's natural resources to guarantee their continued existence and use by the present and future generations." *Id.* § 455D.2(1). One way the general assembly aims to achieve that public policy goal is by having companies "facilitat[e] the recycling of materials that would otherwise be solid waste." *Id.* § 455D.4A(1); *see also id.* § 455D.2(5) ("The reduction of solid waste at the source and the recycling of reusable waste materials will reduce the flow of waste to sanitary landfills and increase the supply of reusable materials for the use of the public.").

So, solid waste in chapter 455B does not include "[m]aterial that is legitimately recycled pursuant to section 455D.4A." *Id.* § 455B.301(29)(*f*). The recycling statute—section 455D.4A—sets out various regulations to determine whether the recycling of a given material is "legitimate" and thus "excluded from the solid waste provisions of chapter 455B." *Id.* § 455D.4A(2).

When a recycling facility allows material to accumulate with only a speculation of being recycled (i.e., when the material is stored for recycling but not processed), the material is not "legitimately recycled." *Id.*; *see also id.* § 455D.4A(6) ("[A] recycling facility owner or operator shall ensure that stockpiled material is not speculatively accumulated . . . ."). The burden rests with the recycling facility owner or operator to establish that material is not accumulated speculatively: "[T]he recycling facility owner or operator must document that, during a given calendar year, the amount of material that is recycled, or transferred to a different site for recycling, equals at least seventy-five percent by weight or volume of the amount of material accumulated at the beginning of the period." *Id.* § 455D.4A(7).

Failing to legitimately recycle material under chapter 455D means that it becomes solid waste and subject to the provisions of chapter 455B. *Id.* § 455D.4A(2) ("A material that is not legitimately recycled is discarded material and is a solid waste."). And "[a]ny person who violates" section 455B.307(1) "shall be subject to a civil penalty, not to exceed five thousand dollars for each day of such violation." *Id.* § 455B.307(3). The DNR may compel the attorney general to "institute any legal proceedings necessary in obtaining compliance . . . or prosecuting any person" who violates section 455B.307(1). *Id.* § 455B.307(2).

## II. Factual Background and Proceedings.

This appeal reaches us following a motion to dismiss, so we construe the facts pleaded in the petition as true. *E.g.*, *Benskin, Inc. v. W. Bank*, 952 N.W.2d 292, 298 (Iowa 2020). Donald Lilly is the chief executive officer of Global Fiberglass Solutions, Inc. (GFS, Inc.) and Global Fiberglass Solutions of Texas, LLC (GFS Texas). Ronald Albrecht is a director of GFS, Inc. and the chief operating officer of GFS Texas. Those two GFS entities (collectively GFS) are in the business of recycling decommissioned wind turbine blades. The State's petition alleges that, in November 2017, GFS contracted with General Electric and MidAmerican Energy Company to recycle about 1,300 decommissioned blades. GFS stored roughly 868 blades at a site in Newton, 400 blades in Ellsworth (once they were removed from a site in Fort Dodge), and 22 blades in Atlantic.

In August 2018, the DNR received a complaint that those decommissioned blades were being improperly recycled. So, it visited the site in Newton and began to raise concerns about speculative accumulation. The DNR visited the site in Fort Dodge a year later and took photos of GFS's still-unprocessed blades. The DNR also sent a letter of inquiry to GFS and the owner of the Fort Dodge site,

asking about their plans to legitimately recycle the blades under section 455D.4A. GFS responded and provided documents in support of its answers. One of the documents was a purchase contract for the blades between three other out-of-state GFS entities that were dismissed from this lawsuit for lack of personal jurisdiction and an unidentified end user of the recycled product. The contract listed Lilly and Albrecht as "managers" of the GFS entity selling the recycled product to the end user.

During an inspection of the Fort Dodge site in February 2020, the DNR learned from the site owner that GFS failed to remove the blades by the deadline in the parties' contract. GFS had also stopped making rent payments. The DNR issued GFS a notice of violation the following month. Its notice stated that the decommissioned blades were not being legitimately recycled under section 455D.4A, so they were deemed discarded material and subject to Iowa's solid waste laws. The notice further stated that the stockpile of blades did not comply with chapter 455B because none of the sites are sanitary disposal projects and GFS did not have permits to dump the blades there. *See* Iowa Code § 455B.307(1). The DNR notified GFS that it would pursue further enforcement action.

The DNR's legal services bureau began to develop a compliance plan with GFS in March 2020, resulting in a fully executed consent order by December. *See id.* § 455B.307(2). The parties executed an amended consent order in February 2021 that required GFS to take "concrete steps" to obtain and use recycling equipment and to process its stockpiled blades. Lilly signed the consent order on behalf of GFS. The consent order had two primary requirements: (1) GFS needed to properly recycle certain percentages of its blades by specified deadlines; and (2) GFS needed to provide a $2,000,000 surety bond that the DNR

could use in the event that the State needed to remove, transport, or dispose of the blades because GFS failed to comply with the consent order. The DNR granted several extensions for GFS to obtain the surety bond, but GFS ultimately failed to meet the DNR's final deadline for posting the bond in April 2021.

The DNR consequently issued an administrative order based on GFS's failure to comply with the consent order. After GFS did not remedy the speculative accumulation of its blades within sixty days of the administrative order, the DNR referred GFS to the Iowa Attorney General's Office for enforcement. *See id.* MidAmerican and General Electric eventually disposed of the decommissioned blades that GFS failed to recycle.

The State, in addition to seeking civil penalties and a permanent injunction against GFS, also seeks to hold Lilly and Albrecht personally responsible for GFS's alleged violations of Iowa's solid waste and recycling laws. *See id.* § 455B.307(1) (limiting where solid waste can be dumped or deposited); Iowa Admin. Code r. 567—100.4 (regulating solid waste disposal); *see also* Iowa Code § 455D.4A(6) (requiring parties to prevent recycled material from speculatively accumulating). The State requests a civil penalty against both corporate officers and a permanent injunction against each of them from further violations. *See* Iowa Code § 455B.307(2)–(3).

Lilly and Albrecht, both of whom live in the State of Washington, moved to dismiss the claims against them individually, asserting that the district court lacked personal jurisdiction over them. They supported their motion with cursory affidavits, each claiming they had never been to Iowa—at least not "for business purposes"—and were not "personally involved in the transactions and conduct complained of in the Petition." The State's resistance relied largely on the allegations in its petition; it did not seek jurisdictional discovery. *See, e.g.,*

*Book v. Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 581 (Iowa 2015) ("[T]he district court granted SICE's motion and deferred ruling on Doublestar's motion [to dismiss for lack of personal jurisdiction] to allow jurisdictional discovery to 'resolve the question of how the tire arrived in Iowa . . . .' ").

The district court denied Lilly and Albrecht's motion to dismiss for lack of personal jurisdiction, citing caselaw from other jurisdictions concluding that the responsible corporate officer doctrine can "hold corporate officers in responsible positions of authority personally liable for violating strict liability statutes protecting the public welfare." *People v. Roscoe*, 87 Cal. Rptr. 3d 187, 189 (Ct. App. 2008); *accord United States v. Park*, 421 U.S. 658, 673–74 (1975). It thus denied the motion to dismiss Lilly and Albrecht "based on their directorial relationships to the corporations directly involved in the complained-about conduct." Lilly and Albrecht sought an interlocutory appeal of that ruling, and we granted their application.

**III. Analysis.**

Lilly and Albrecht challenge the district court's refusal to dismiss them from the State's action on two grounds. First, they argue that the district court erred in concluding that they could be personally responsible under the responsible corporate officer doctrine for the alleged violations of state law. Second, they argue that the district court lacks personal jurisdiction over them even if they could be subject to personal liability under Iowa's solid waste and recycling statutes. The State counters that Lilly and Albrecht are proper defendants and that the district court properly exercised personal jurisdiction over both individuals. We address the issues in turn.

**A. Whether the Officers Could Be Subject to Liability Under Iowa Code Section 455B.307.** We review a motion to dismiss and rulings on statutory

interpretation for correction of errors at law. *Struck v. Mercy Health Servs.-Iowa Corp.*, 973 N.W.2d 533, 538 (Iowa 2022). The district court denied defendants' motion to dismiss because, after surveying persuasive authority, it interpreted Iowa's solid waste and recycling statutes to permit personal liability for Lilly and Albrecht. Under that authority, when a strict liability public welfare statute is violated and "a corporate officer participates in the wrongful conduct, or knowingly approves the conduct, the officer, as well as the corporation, is liable for the penalties." 3A William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 1135 & n.4, Westlaw (database updated Sep. 2025) [hereinafter Fletcher, *Fletcher Cyclopedia*] (citing *Est. of Countryman v. Farmer's Coop. Ass'n,* 679 N.W.2d 598, 604 (Iowa 2004), as applying the rule to an LLC member).

1. *Iowa Code section 455B.307(3)'s imposition of sanctions on "[a]ny person" includes responsible corporate officers.* The State asks us to rely on the responsible corporate officer doctrine in interpreting Iowa's solid waste and recycling statutes—specifically, Iowa Code section 455B.307. GFS allegedly violated that solid waste statute after repeated failures to legitimately recycle its decommissioned wind turbine blades pursuant to section 455D.4A. Specifically, the State alleges that the defendants, including Lilly and Albrecht, allowed the decommissioned wind turbine blades to speculatively accumulate at three unpermitted locations over a period of years instead of recycling them.

"[A] recycling facility owner or operator" is required to "ensure that stockpiled material is not speculatively accumulated." *Id.* § 455D.4A(6). When "stockpiled material" is allowed to "speculatively accumulate[]," *id.*, it becomes solid waste and subject to the provisions of chapter 455B, *id.* § 455D.4A(2). Section 455B.307(1) imposes strict liability on "[a] private agency or public

agency" for dumping, depositing, or permitting another to dump or deposit "any solid waste at any place other than a sanitary disposal project approved by the [DNR] director" without a permit. *Id.* § 455B.307(1). Subsection (2) then instructs the attorney general, upon the DNR's request, to bring "any legal proceedings necessary" to "prosecut[e] any person" for violating that law. *Id.* § 455B.307(2). And subsection (3) authorizes a civil penalty against "[a]ny person who violates" the statute. *Id.* § 455B.307(3).

Section 455B.307 is the type of strict liability public welfare law to which the responsible corporate officer doctrine has been applied in other jurisdictions. *E.g., Morissette v. United States*, 342 U.S. 246, 254–55 (1952) (discussing laws that "have been aptly called 'public welfare offenses' " because they "heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare"). For instance, in addressing federal statutes closely analogous to the statute at issue here, the United States Court of Appeals for the Eighth Circuit interpreted federal solid waste statutes that "impose[] strict liability upon 'any person' " to include personal liability for corporate officers. *United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726, 743 (8th Cir. 1986) (quoting 42 U.S.C. § 9607(a)(3)); *id.* at 745 (quoting 42 U.S.C. § 6973(a)). The Eighth Circuit reasoned that "imposing liability upon only the corporation, but not those corporate officers and employees who actually make corporate decisions, would be inconsistent with Congress'[s] intent to impose liability upon the persons who are involved in the handling and disposal of hazardous substances." *Id.* at 745. Rejecting the doctrine would create an "enormous, and clearly unintended, loophole in the statutory scheme." *Id.* at 743.

Interpreting strict liability public welfare statutes to impose liability on the corporate officers responsible for the entity's violation is nothing new. The United States Supreme Court first applied the responsible corporate officer doctrine in 1943 in *United States v. Dotterweich*, 320 U.S. 277, 281–82 (1943), when it interpreted the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301. There, the Court recognized that "the only way in which a corporation can act is through the individuals who act on its behalf." *Dotterweich*, 320 U.S. at 281. So, when a corporation's president and general manager was charged because his company shipped adulterated and misbranded drugs, he could be found guilty by virtue of his "standing in various relations to the incorporeal proprietor" that violated legislation "touch[ing] phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection." *Id.* at 280, 283. The Court upheld the corporate officer's criminal conviction. *Id.* at 278–79.

The Court took up the doctrine again thirty-two years later in *United States v. Park*, 421 U.S. at 671, reinforcing its rationale. The Court held that responsible corporate officers have "not only a positive duty to seek out and remedy violations when they occur but also, and primarily, a duty to implement measures that will insure that violations will not occur." *Id.* at 672. The decision clarified what it is that makes a corporate officer responsible for the company's illegal conduct:

> The concept of a "responsible relationship" to, or a "responsible share" in, a violation of the Act indeed imports some measure of blameworthiness; but it is equally clear that the Government establishes a prima facie case when it introduces evidence sufficient to warrant a finding by the trier of the facts that the defendant had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and that he failed to do so. The failure thus to fulfill the duty imposed by the interaction of the

> corporate agent's authority and the statute furnishes a sufficient causal link. The considerations which prompted the imposition of this duty, and the scope of the duty, provide the measure of culpability.

*Id.* at 673–74. In *Park*, the Court affirmed the conviction of a corporation's president and chief executive officer for shipping adulterated food that was contaminated by rodents in the firm's warehouse. *Id.* at 660, 676–78.

We cited *Dotterweich* and *Park* favorably in *Randall's International Inc. v. Hearing Board of the Iowa Beer & Liquor Control Department*, 429 N.W.2d 163, 164 (Iowa 1988), and *Iowa City v. Nolan*, 239 N.W.2d 102, 104–05 (Iowa 1976) (en banc). Both cases quoted the same excerpt from *Dotterweich*: "In the interest of the larger good [the responsible corporate officer doctrine] puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger." *Randall's Int'l Inc.,* 429 N.W.2d at 164 (quoting *Dotterweich*, 320 U.S. at 281); *Nolan*, 239 N.W.2d at 104 (quoting *Dotterweich*, 320 U.S. at 281). The State argues that we applied the doctrine in *State ex rel. Miller v. Santa Rosa Sales & Marketing, Inc.*, where we affirmed the conviction of a corporation's president based in part on his "complete control of" a company that violated Iowa's consumer fraud laws. 475 N.W.2d 210, 219–20 (Iowa 1991), *superseded by statute on other grounds*, 1992 Iowa Acts ch. 1242, § 37 (codified at Iowa Code § 910.7A (1993)), *as recognized in State v. Hagen*, 840 N.W.2d 140 (Iowa 2013). Although our holding in *Santa Rosa Sales & Marketing* did not need to rely on the responsible corporate officer doctrine given the officer's "own personal acts in perpetrating consumer fraud," we approvingly cited cases from other jurisdictions that imposed personal consequences on corporate officers. *Id.* (citing *United States v. Cattle King Packing Co.*, 793 F.2d 232, 240 (10th Cir. 1986); *State v. Kailua Auto Wreckers, Inc.*, 615 P.2d 730, 737 (Haw. 1980); *State*

*v. Placzek*, 380 A.2d 1010, 1015 (Me. 1977); *Bourgeois v. Commonwealth*, 227 S.E.2d 714, 718 (Va. 1976); *Miller v. State*, 732 P.2d 1054, 1059 (Wyo. 1987)). We also rejected the officer's contention that corporate veil piercing analysis was necessary for personal liability. *Id.*

We view the responsible corporate officer doctrine as a rule of interpretation for environmental statutes and other public welfare laws that impose strict liability on persons responsible for the statutory violation. The interpretation makes sense because environmental laws often involve sins of omission. For example, here, the alleged offense was not moving the discarded turbine blades to a temporary storage location before recycling them, but leaving them there and never doing anything to recycle them.

The fact that a corporation is a distinct legal entity from its owners and officers does not prevent a statute from imposing liability on individuals for conduct they undertake on behalf of the entity. *E.g., BEC Corp. v. Dep't of Env't Prot.*, 775 A.2d 928, 937 (Conn. 2001) ("[U]nder § 22a–432, the mere fact that a 'person' who is polluting is a corporate officer does not automatically shield that officer from liability for his own actions or omissions."); *cf. Est. of Countryman*, 679 N.W.2d at 604 ("The [Iowa Limited Liability Company Act] does not insulate a manager from liability for participation in tortious conduct merely because the conduct occurs within the scope and role as a manager."). The general assembly imposed such liability here. It enacted a strict liability environmental statute regulating the conduct of any "private agency or public agency" engaged in solid waste disposal, Iowa Code § 455B.307(1), and it then broadly allowed "a civil penalty" against "[a]ny person who violates" the relevant solid waste disposal provisions, *id.* § 455B.307(3). This statutory scheme encompasses the responsible corporate officer doctrine. Imposing personal liability on corporate

officers who are responsible for an entity's violation of a public welfare law prevents entities from merely factoring civil penalties into the cost of doing business. We have recognized this concept under Iowa law: "The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion that it might reasonably exact from one who assumed his responsibilities." *Nolan*, 239 N.W.2d at 104 (quoting *Morissette*, 342 U.S. at 256).

Numerous states have interpreted similar environmental statutes to impose personal liability on corporate officers responsible for the violations. *See, e.g.*, *Roscoe*, 87 Cal. Rptr. 3d at 190 (holding that "the responsible corporate officer doctrine applies to section 25299, subdivision (a)(6)," which imposes strict civil liability on "[a]ny operator of an underground tank system" for violating regulations adopted by the State Water Resources Control Board (alteration in original) (quoting Cal. Health & Safety Code § 25299(a))); *People ex rel. Burris v. C.J.R. Processing, Inc.*, 647 N.E.2d 1035, 1036–39 (Ill. App. Ct. 1995) (reversing the circuit court's dismissal of action against corporate officer for violations of the Illinois Environmental Protection Act, rejecting district court's reasoning that the definition of "person" did not include "corporate officers" and holding that the executive vice president and chief operating officer who was "responsible for CJR and control[ed] its activities" and " 'caused or allowed' all of the violations to occur" could be personally liable, rejecting a contrary holding in *Illinois v. Celotex Corp.*, 516 F. Supp. 716 (C.D. Ill. 1981), to which it owed no deference as a federal district court interpreting Illinois law); *Comm'r, Ind. Dep't of Env't Mgmt. v. RLG, Inc.*, 755 N.E.2d 556, 560–61 (Ind. 2001) (collecting cases from "several states [that] have adopted the responsible corporate officer doctrine as appropriate under state legislation addressing public safety, in particular,

disposal of hazardous waste" and applying the doctrine to the civil penalty provisions of Indiana Code section 13-30-4-1, which "imposes civil liability on 'a person who violates' environmental management laws" (quoting Ind. Code § 13-30-4-1 (1998))); *In re Dougherty*, 482 N.W.2d 485, 489 (Minn. Ct. App. 1992) ("We determine in the instant case: (1) the responsible corporate officer doctrine applies to the statutes and regulations at issue," based on imposition of liability on a "person"; "and (2) relator Dougherty can be held liable under an application of the doctrine."); *State ex rel. Webster v. Mo. Res. Recovery, Inc.*, 825 S.W.2d 916, 926 (Mo. Ct. App. 1992) ("We believe the general assembly had a wide-ranging intent to impose liability upon all persons involved in the handling and disposal of hazardous wastes, including officers and directors of a certified resource recovery facility, when the officer or director actively controls or is directly involved in the proscribed activity."); *State v. Lundgren*, 971 P.2d 948, 952 n.10, 953 (Wash. Ct. App. 1999) (holding that "[b]ecause the facts as found by the PCHB establish that Lundgren controlled the facility with knowledge of the violations, he is personally liable under RCW 90.48.080 and RCW 90.48.144," which make it unlawful for "any person" to discharge pollutants into the water and impose civil penalties on "[e]very person" who does so (quoting Wash. Rev. Code §§ 90.48.080, .144)); *State v. Rollfink*, 475 N.W.2d 575, 582 (Wis. 1991) ("In concluding that the defendant was an operator within the meaning of Wis. Admin. Code sec. NR 181.04(70), we do not hold or imply that every corporate officer or majority shareholder is subject to personal liability for violations of ch. 144, Stats., committed by the corporation. The test of liability under sec. NR 181.04(70) is that of responsibility for the overall operation of the facility in question. . . . In the case at bar, the corporate officer/defendant was responsible for the overall operation of a hazardous waste facility and, therefore,

is personally liable for operating the facility in violation of secs. 144.44(4)(a) and 144.63, Stats.").[2]

Delaware—often viewed as a persuasive reference point for questions of corporate law—recognizes that responsible corporate officers can be held personally liable for violations of Delaware's solid waste disposal statutes. *See T.V. Spano Bldg. Corp. v. Dep't of Nat. Res. & Env't Control*, 628 A.2d 53, 60 (Del. 1993) (en banc) (concluding that Delaware's solid waste disposal statute imposing sanctions on a "responsible party" to mean a "person," and holding that "[a]lthough the definition [of responsible party] does not specifically mention officers of a corporation, the definition is broad enough to include a corporate

---

[2]The opinion concurring in the judgment errs by claiming that the absence of "responsible corporate officer" from the definition of "person" in chapter 455B means the doctrine cannot apply to section 455B.307. *See Celentano v. Rocque*, 923 A.2d 709, 722 n.12 (Conn. 2007) (explaining that the term "person" in one statute does not exclude corporate officers just because another statute expressly includes those individuals, but rather "simply necessitates the comprehensive analysis of that statute's language and purpose"). The concurrence notes that some states have enacted statutes that expressly define "person" to include a "responsible corporate officer" or similar language in certain circumstances, including California, Indiana, and Wisconsin. *See, e.g.*, Cal. Pub. Res. Code §§ 25321(b) (imposing sanctions for failing to provide required data), 25362(e) (imposing sanctions for failing to timely provide required information reports) (West 2026); Ind. Code § 13-11-2-191(a) (2025) (defining "responsible party" for purposes of obtaining permits); Wis. Stat. § 283.91(6) (2025) (defining "person" for purposes of two subsections of the civil and criminal remedy provision for water pollution discharge violations to include a "responsible corporate officer").

What the concurrence fails to also note is that those are not the statutes that impose strict liability civil sanctions for violating environmental protection statutes in those states. Nor does it note that courts in those states have applied the responsible corporate officer doctrine to statutes that do impose civil sanctions even when liability applies broadly, for example, to "any operator," *see Roscoe*, 87 Cal. Rptr. 3d at 190 (applying responsible corporate officer doctrine to California Health and Safety Code section 25299), to "a person," *see Comm'r, Ind. Dep't of Env't Mgmt.*, 755 N.E.2d at 560–61 (applying the doctrine to Indiana Code section 13-30-4-1 (1998)), or to "an operator," *see Rollfink*, 475 N.W.2d at 582 (applying the doctrine to Wisconsin Statutes sections 144.44(4)(a) and 144.63), without explicitly including "responsible corporate officers" within the relevant term. Those state courts were not deterred by the inclusion of "corporate officer" in the definition of "person" in other parts of their state codes.

That the concurrence found other statutes in the Iowa Code that use the term "corporate officer" in entirely different contexts—e.g., sales tax violations or securities fraud violations where the general assembly sought to impose vicarious liability on such officers—says nothing about the doctrine's application to Iowa Code section 455B.307(3)'s sanctions against "[a]ny person who violates" certain provisions in the chapter.

officer as a responsible party under Section 6308(4) under certain circumstances"). The Supreme Court of Delaware relied on "[f]ederal decisional law interpreting the Resource Conservation and Recovery Act," which "also holds that responsible corporate officers may be held personally liable for the improper disposal of hazardous waste." *Id.* at 61 (citing *Ne. Pharm. & Chem. Co.*, 810 F.2d 726, as one example of the responsible corporate officer doctrine).

We read Iowa law similarly. The responsibility for ensuring compliance with the recycling and solid waste regulatory requirements includes not only the "private agency," Iowa Code § 455B.307(1), but also the "recycling facility owner or operator," *id.* § 455D.4A(6). While responsibility for compliance is imposed on the "facility owner or operator," *id.*, the civil penalty imposed by Iowa Code section 455B.307(3) extends to "[a]ny person" who illegally dumps or deposits solid waste in violation of the relevant statutory provisions or an order issued pursuant to such provisions. *See id.* § 455B.307(2)–(3); *see also* Noah Dreeben et al., *Environmental Crimes*, 61 Am. Crim. L. Rev. 571, 577 (2024) (recognizing that, "[i]n the corporate arena, the 'responsible corporate officer' doctrine imposes individual liability on those with the responsibility or authority to prevent or correct the violation, in addition to those who actually commit the contaminating act" when "sanctions under environmental statutes apply to any 'person' who violates a regulation"). "Person" certainly includes entities like GFS, *see* Iowa Code § 4.1(20), but it also includes individuals like Lilly and Albrecht, who, for purposes of reviewing the motion to dismiss, are considered the responsible corporate officers of the recycling facility that allowed the decommissioned blades to accumulate without being disposed of properly.

2. *The petition states a claim against Lilly and Albrecht as "person[s]" subject to Iowa Code section 455B.307(3).* Corporate officers are generally found

to be responsible for violations of a strict liability public welfare statute when three elements are met: (1) the individual is "in a position of responsibility" relevant to the corporate policy or activity at issue; (2) there is a nexus between the individual's position and the violation "such that the individual could have influenced the corporate actions" resulting in the violations; and (3) "the individual's actions or inactions facilitated the violations." *In re Dougherty*, 482 N.W.2d at 490 (citing *Park*, 421 U.S. at 673–74; *Dotterweich*, 320 U.S. at 284); *accord BEC Corp.*, 775 A.2d at 937–38 ("In large part, we adopt the language of *Matter of Dougherty* in defining the liability of corporate officers under the act."); *Comm'r, Ind. Dep't of Env't Mgmt.*, 755 N.E.2d at 561 (calling the three-element framework from *In re Dougherty* "a fair restatement of the responsible corporate officer doctrine"); 3A Fletcher, *Fletcher Cyclopedia* § 1135 (reciting same three-element framework). In *In re Dougherty*, that standard was met where (1) the officer "was in a position of responsibility as president and primary emergency coordinator"; (2) he "was the primary contact with all regulatory bodies concerning hazardous waste and the person ultimately in charge of operations at the facility"; and (3) he "failed to prevent the violations and take proper corrective action once the violations occurred" despite his awareness of them. 482 N.W.2d at 490.

A closer review of how courts have applied the responsible corporate officer doctrine reveals that the nexus and facilitation elements impose concrete limitations. *See id.*; *see also T.V. Spano Bldg. Corp.*, 628 A.2d at 61 (recognizing that officers can be personally liable for some solid waste violations, but only under particular conditions). For example, the corporate officer from *In re Dougherty* did not satisfy the nexus element simply because he was a high-ranking corporate leader. 482 N.W.2d at 490 ("[A] corporate officer will not be

held liable solely because of the individual's position within the corporation."). Rather, it was because he was the "primary contact" dealing with the regulatory bodies when his company violated strict liability hazardous waste disposal laws. *Id.* The violations "were clearly within his sphere of influence and involvement" where he was the person in charge of the relevant violations. *Id.*

In addition to the nexus requirement, the officer must have also facilitated the violation. *Id.* In this regard, the Supreme Court of Delaware required "[t]he State [to] show that the officer directed, ordered, ratified, approved, or consented to the improper disposal." *T.V. Spano Bldg. Corp.*, 628 A.2d at 61. This could encompass not only violations that the officer authorized and directed, but also violations that were "in the regular course of that business, with [the officer's] knowledge and with their consent or approval, or such acquiescence on [the officer's] part as warrants inferring such consent or approval." *Id.* (quoting 3A William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 1135 (1990)). But "[i]t is not enough that the officer knew of an improper disposal." *Id.* "Simple knowledge is not sufficient for the imposition of personal liability." *Id.*

We conclude that these limitations provide an appropriate benchmark for interpreting Iowa Code section 455B.307 as it applies to responsible corporate officers.

Under our notice pleading standard, a "petition need not allege ultimate facts that support each element of the cause of action" or "identify a specific legal theory." *Mormann v. City of Manchester*, 27 N.W.3d 820, 834 (Iowa 2025) (quoting *Terrace Hill Soc'y Found. v. Terrace Hill Comm'n*, 6 N.W.3d 290, 296 (Iowa 2024)). A petition only needs to "contain factual allegations that give the defendant 'fair notice' of the claim asserted so the defendant can adequately

respond." *Id.* (quoting *Terrace Hill Soc'y Found.*, 6 N.W.3d at 296). "[F]air notice" requires a petition to "inform[] the defendant of the incident giving rise to the claim and of the claim's general nature." *Id.* (quoting *Terrace Hill Soc'y Found.*, 6 N.W.3d at 296).

Here, the State satisfied our notice pleading standard. *See Rees v. City of Shenandoah*, 682 N.W.2d 77, 79 (Iowa 2004) (stating that "nearly every case will survive a motion to dismiss" because a petition merely needs to "inform[] the defendant of the incident giving rise to the claim and of the claim's general nature"). The State pleaded that Lilly was "the Chief Executive Officer of GFS and GFS Texas"; was a manager of three GFS-related entities alleged to have entered purchase agreements with end users of the recycled blades; and "was at all times relevant to this action a responsible corporate officer of GFS, GFS Texas, [and the related entities]." The State pleaded that Albrecht was the "Chief Operating Officer of GFS and GFS Texas"; was a manager of three GFS-related entities alleged to have entered purchase agreements with end users of the recycled blades; and "was at all times relevant to this action a responsible corporate officer of GFS, GFS Texas, [and the related entities]." And the State pleaded that all the defendants, including Lilly and Albrecht, improperly and illegally permitted the waste turbine blades to speculatively accumulate at sites across Iowa in violation of various statutes, regulations, and orders—including a strict liability public welfare statute. The pleadings adequately put each of the officers on notice of the incident giving rise to the claim and the theory of their liability. *See Mormann*, 27 N.W.3d at 834; *Rees*, 682 N.W.2d at 79.

Therefore, the district court properly denied Lilly and Albrecht's motion to dismiss to the extent that they argued they could not be subject to personal liability. *See Haupt v. Miller*, 514 N.W.2d 905, 910–11 (Iowa 1994) (en banc)

("Although it is not possible to determine at the pleading stage what, if any, participation the various defendants had in this transaction so as to expose them to liability under this general duty, that uncertainty does not allow the sustaining of a motion to dismiss . . . . Conceivably, plaintiff can show that any one of the named defendants played a role in this transaction that triggered a duty to handle the Thies guarantee agreement in a more protective manner.").

**B. Whether the Officers Are Subject to Personal Jurisdiction.** Lilly and Albrecht also contend that, even if the petition sufficiently alleges that they are liable under Iowa Code section 455B.307, they lack sufficient contacts with the State of Iowa for the district court to exercise personal jurisdiction over each of them individually. "We review a ruling on a motion to dismiss for lack of personal jurisdiction for correction of errors at law." *State ex rel. Bird v. TikTok, Inc.,* 30 N.W.3d 732, 736 (Iowa 2026); *accord PSFS 3 Corp. v. Michael P. Seidman, D.D.S., P.C.,* 962 N.W.2d 810, 826 (Iowa 2021). As we review the ruling, "we accept the facts alleged in the petition and the contents of uncontroverted affidavits as true." *TikTok, Inc.,* 30 N.W.3d at 736. The plaintiff's allegations must "make a prima facie showing that the exercise of personal jurisdiction is allowed." *Harding v. Sasso,* 2 N.W.3d 260, 265 (Iowa 2023). "Once the plaintiff establishes a prima facie case for personal jurisdiction, the burden shifts to the defendant to rebut it." *TikTok, Inc.,* 30 N.W.3d at 736. The defendant rebuts personal jurisdiction by adding uncontested facts to the mix that show exercising it would be "unreasonable or otherwise improper." *Harding,* 2 N.W.3d at 265.

Iowa's courts exercise personal jurisdiction "in every case not contrary to the provisions of the Constitution of the United States." Iowa R. Civ. P. 1.306; *accord Harding,* 2 N.W.3d at 264 (permitting "the widest exercise of personal jurisdiction allowed under the Supreme Court's precedents interpreting the

Fourteenth Amendment"). "As a result, our personal jurisdiction analysis in this case collapses into an inquiry about the scope of the Due Process Clause's limits." *TikTok, Inc.*, 30 N.W.3d at 736. The inquiry turns on whether the defendants had sufficient "minimum contacts" with Iowa such that haling them into court here "does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)); *accord Ostrem v. Prideco Secure Loan Fund, LP*, 841 N.W.2d 882, 891–92 (Iowa 2014). Specific personal jurisdiction exists over a nonresident who directs activities into Iowa that give rise to the particular claim. *See Harding*, 2 N.W.3d at 264–65; *Cap. Promotions, L.L.C. v. Don King Prods., Inc.*, 756 N.W.2d 828, 833 (Iowa 2008). "[P]ersonal jurisdiction must be determined as to each defendant individually based on that defendant's contacts with the forum state." *Hammond v. Fla. Asset Fin. Corp.*, 695 N.W.2d 1, 7–8 (Iowa 2005).

1. *Personal jurisdiction over Lilly.* The State met its burden to establish personal jurisdiction over Lilly. *See Harding*, 2 N.W.3d at 265 ("The contact necessary to support the exercise of specific jurisdiction is not great."). Lilly signed his name to a consent order on behalf of GFS, agreeing that GFS would recycle its decommissioned blades and provide the DNR with a surety bond. Failure to comply with this consent order forms the basis for the DNR's action against GFS. Lilly's involvement in the DNR's inquiry supports the DNR's claim that he sufficiently directed GFS's operations in Iowa to support the exercise of specific personal jurisdiction over him individually. *See, e.g., LeDuc v. Ky. Cent. Life Ins.*, 814 F. Supp. 820, 825 (N.D. Cal. 1992) (holding that plaintiffs pleaded sufficient facts to establish jurisdiction over "Defendant Burnett, the President and Chairman of the Board of Kentucky Central," where the plaintiffs alleged

that "he authored a letter to policyholders, including those in California, which assured them that 'there is absolutely no reason for you to be concerned about your policy's safety or about Kentucky Central's stability,'" and "the writing of such a letter of assurance to Kentucky Central policyholders is an act directed to the forum which is closely linked [to] the allegations of th[e] litigation" asserting fraudulent concealment of the financial downfall of the company).

Lilly's claim that he has never been to Iowa for business purposes does not defeat jurisdiction. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984))). And his claim that he was not "personally involved in the transactions and conduct complained of in the Petition" does not undermine the inferences from Lilly's signature on the consent order that forms the basis for the State's action that he was responsible for GFS's conduct at issue in this case.

2. *Personal jurisdiction over Albrecht.* Turning to Albrecht, we conclude that the State did not meet its jurisdictional burden. *Cf. LeDuc*, 814 F. Supp. at 825–26 (analyzing personal jurisdiction for each defendant individually and concluding that all but one lacked sufficient contacts with the forum state). "Liability and jurisdiction are independent. Liability depends on the relationship between the plaintiff and the defendants and between the individual defendants; jurisdiction depends only upon each defendant's relationship with the forum." *MFS Series Tr. III ex rel. MFS Mun. High Income Fund v. Grainger*, 96 P.3d 927, 933 (Utah 2004) (quoting *Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990)). Although the State sufficiently pleaded claims against Albrecht using the

responsible corporate officer doctrine, it does not necessarily follow that the State has shown that Albrecht has sufficient contacts with Iowa to support personal jurisdiction over him. *Cf. In re Reddam,* 180 A.3d 683, 690 (N.H. 2018) ("The mere fact that a corporate officer can and generally does control a corporation does not mean that the officer directed the *specific* actions that brought liability upon the corporation and its controlling officers."). Personal jurisdiction is distinct from personal liability.

Unlike Lilly, the record does not show that Albrecht signed any contracts or otherwise acted on GFS's behalf related to the failure to properly recycle or dispose of the turbine blades—the conduct that forms the basis for the State's claimed regulatory violations. The State argues that jurisdiction is proper over Albrecht because a contract that GFS provided to the DNR listed him as a "manager" of companies that sell GFS's recycled product once it has been processed. But those separate entities were dismissed from this case because the record does not reveal that those entities' subsequent attempts to sell the decommissioned blades are related to GFS's violations of the solid waste regulations on the front end. Merely being connected to GFS in a way that is unrelated to the claims cannot establish jurisdiction. *See LeDuc,* 814 F. Supp. at 825–26; *cf. Reddam,* 180 A.3d at 690–91 ("[E]vidence that Reddam had knowledge of, controlled, and directed the respondent companies' actions that violated RSA chapter 399–A can support a finding that the Department has specific personal jurisdiction over him.").

The district court found that because "Albrecht avers none of the three . . . companies [of which he is listed as a manager] have ever done business in the State of Iowa," the companies lacked sufficient minimum contacts here for an Iowa court to exercise personal jurisdiction over them. Albrecht's

management of companies that lacked sufficient contacts with Iowa to hale them into court certainly does not support personal jurisdiction over Albrecht individually. Thus, we reverse the district court's denial of Albrecht's motion to dismiss and remand for dismissal of the State's claims against him without prejudice. *See* Iowa R. Civ. P. 1.946; *Hammond*, 695 N.W.2d at 8; *Jorge Constr. Co. v. Weigel Excavating & Grading Co.*, 343 N.W.2d 439, 444 (Iowa 1984).

**IV. Conclusion.**

For these reasons, we affirm the district court's ruling as to Lilly but not as to Albrecht. We reverse the denial of Albrecht's motion to dismiss for lack of personal jurisdiction and remand for dismissal of the State's claims against him without prejudice.

**Affirmed in Part, Reversed in Part, and Case Remanded.**

Christensen, C.J., and Waterman, Mansfield, and McDermott, JJ., join this opinion. May, J., files an opinion concurring in the judgment, in which McDonald, J., joins.

**May, Justice (concurring in the judgment).**

There is good news, and there is troubling news. The good news is that the majority seems to accept Delaware's reasonable limits on corporate officers' personal liability for environmental violations. *See T.V. Spano Bldg. Corp. v. Dep't of Nat. Res. & Env't Control*, 628 A.2d 53, 61 (Del. 1993) (en banc). At least, the majority concedes that those limits "provide an appropriate benchmark for interpreting Iowa Code section 455B.307," the solid waste disposal statute at issue here. Under those commonsense limits, even a corporate officer who knows of a violation cannot be *personally* liable unless the State proves "the officer directed, ordered, ratified, approved, or consented to the improper disposal" that violated the statute. *T.V. Spano Bldg. Corp.*, 628 A.2d at 61.

Now for the troubling news. The majority does not seem wholly satisfied with Delaware's limited approach. So the majority has *also* adopted the so-called "responsible corporate officer doctrine," or the RCOD. And potential liability under the RCOD is far broader than under Delaware's narrow approach. By design, the RCOD threatens high-ranking corporate officers with personal liability for the corporation's environmental violations, no matter whether the officer knew of—much less participated in—the violation. And, according to the majority, the RCOD is now "*a rule of interpretation* for environmental statutes and other public welfare laws that impose strict liability on persons responsible for the statutory violation." (Emphasis added.) The majority says this even though no prior Iowa case has adopted the RCOD. Certainly, no prior Iowa case has said that the RCOD is a "rule of interpretation" for any Iowa statute.

Although I appreciate my colleagues' efforts, I cannot agree with their two-step approach. Delaware's limited approach is enough, on its own. There is

no need to *also* adopt the RCOD, much less to anoint it as "a rule of interpretation" for a potentially broad range of Iowa statutes, many of which are not even involved in the case before us. This is not only needless but risky. It invites future RCOD suits, future battles over the limits of RCOD liability, and so on. We should avoid all of that. If we need to discuss the RCOD at all, we should simply say that we aren't adopting it—and leave it at that. I respectfully concur in the judgment.

### I. A Little More Background.

As mentioned, this case involves alleged violations of environmental statutes. The State of Iowa alleges that certain foreign corporate entities—plus two corporate officers (Donald Lilly and Ronald Albrecht) who reside in the State of Washington—committed "violations of Iowa's solid waste laws" by "illegally dispos[ing] of solid waste by speculatively accumulating decommissioned wind turbine blades at several locations in Iowa beginning as early as November 2017, and ma[king] no effort to recycle or otherwise legally dispose of the blades." Lilly, Albrecht, and some of the corporate defendants moved to dismiss for lack of personal jurisdiction. The district court granted the motion as to the corporate movants but denied it as to Lilly and Albrecht. Lilly and Albrecht were granted interlocutory review of that ruling.

Although the motion under review only sought dismissal on personal jurisdiction grounds, our court has addressed three distinct issues, two of which are not jurisdictional.

1. First, the court has considered whether the State's petition adequately pleaded a claim for which relief can be granted against Lilly and Albrecht.

2. Second, the court has considered what standard should be applied when deciding whether corporate officers can be held personally liable for a corporation's environmental violations.

3. Finally, the court has considered the jurisdictional question raised by Lilly and Albrecht's motion.

I agree with the majority's resolution of the pleading issue and the jurisdictional issue. As to the pleading issue, I agree that the State's detail-laden, thirteen-page petition easily meets our notice pleading standards as to the State's claims that all defendants—including Lilly and Albrecht—committed "violations of Iowa's solid waste laws" by "illegally dispos[ing] of solid waste" in the manner described and at the times and places specified in said petition. As to the jurisdictional issue, I also agree that under our well-established minimum-contacts analysis, the district court can exercise personal jurisdiction over Lilly but not over Albrecht.

As mentioned, though, I have concerns about the majority's approach to the larger question: What must be proven to impose personal liability on corporate officers under our solid waste statutes? I turn to that question now.

**II. Proper Boundaries on Personal Liability.**

To find the boundaries of statutory liability, personal or otherwise, we must look to the statute itself. Here, the liability-creating statute is Iowa Code section 455B.307(3) (2024), which says that "[a]ny person who violates" the prohibition on unlawful dumping of solid waste is liable for a civil penalty. And because "person" can include "corporation[s]," "limited liability compan[ies]," and "any other legal entity," *id.* § 4.1(20), it seems clear that the companies that actually handle waste—like the corporate defendants here—can be liable for their own "violation[s]," *id.* § 455B.307(3). Likewise, because "person" also includes

"individual[s]," *see id.* § 4.1(20), it seems plausible that *some* employees of those corporate defendants could be personally liable *if*—and this is the rub—those employees *violated* the prohibition. This aspect is crucial because—again—the Iowa Code only authorizes penalties against "[a]ny person *who violates*" the prohibition. *Id.* § 455B.307(3) (emphasis added).

And so the crucial question is this: When, exactly, does a corporate officer "violate" this sort of prohibition?

I think the commonsense answer is that an officer usually doesn't violate the prohibition unless the officer was "directly and personally engaged in conduct leading to" the violation. 14 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 6770.50, Westlaw (database updated Sep. 2025). This lines up with Iowa's approach to our employment discrimination statutes. In *Rumsey v. Woodgrain Millwork, Inc.*, we held that individuals can't be personally liable for employment discrimination or retaliation unless the individual "is personally involved in, and has the ability to effectuate, an adverse employment action." 962 N.W.2d 9, 36 (Iowa 2021). Likewise, a corporate officer shouldn't be personally liable for an environmental violation unless, at the very least, the officer "is personally involved in" the violation. *Id.*

Delaware has taken a similar approach. As mentioned, the Supreme Court of Delaware recognized that officers can be personally liable for some waste-disposal violations—but only under particular conditions. *T.V. Spano Bldg. Corp.*, 628 A.2d at 61. They can be liable, the court held, for "actually making corporate decisions resulting in the improper disposition of hazardous waste." *Id.* Thus, the officer must have been "actively involved in the alleged violative activity." *Id.* (quoting *United States v. Conservation Chem. Co. of Ill.*, 733 F. Supp. 1215, 1221 (N.D. Ind. 1989)). "The State must show that the officer

directed, ordered, ratified, approved, or consented to the improper disposal." *Id.* This could encompass not only violations that the officer authorized and directed but also violations that were "in the regular course of that business, with [the officer's] knowledge and with their consent or approval, or such acquiescence on [the officer's] part as warrants inferring such consent or approval." *Id.* (quoting 3A William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 1135 (1990)). But "[i]t is not enough that the officer knew of an improper disposal." *Id.* "Simple knowledge," the Delaware court clarified, "is not sufficient for the imposition of personal liability." *Id.*

### III. Kudos to the Majority.

To their credit, the majority appears to adopt Delaware's limits on personal liability for officers. Toward the end of section III.A.2, the majority opinion states:

> [T]he Supreme Court of Delaware required "[t]he State [to] show that the officer directed, ordered, ratified, approved, or consented to the improper disposal." *T.V. Spano Bldg. Corp.*, 628 A.2d at 61. This could encompass not only violations that the officer authorized and directed, but also violations that were "in the regular course of that business, with [the officer's] knowledge and with their consent or approval, or such acquiescence on [the officer's] part as warrants inferring such consent or approval." *Id.* (quoting 3A William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 1135 (1990)). But "[i]t is not enough that the officer knew of an improper disposal." *Id.* "Simple knowledge is not sufficient for the imposition of personal liability." *Id.*

(Second and subsequent alterations in original.)

The opinion goes on to say that "these limitations provide an appropriate benchmark for interpreting Iowa Code section 455B.307 as it applies to responsible corporate officers."

I think the statements just quoted are enough. They offer an adequate explanation of the standard governing personal liability for corporate officers. No more is needed.

## IV. Why Say More?

Although no more is needed, the majority opinion says much more. Indeed, the majority performs a sort of "two-step" maneuver. First, the majority adopts the RCOD, which it calls a "rule of interpretation" for a potentially wide range of statutes. Then, the majority seems to impose certain limits on the RCOD by adopting the Delaware approach as a "benchmark" for interpreting section 455B.307. And again, I certainly applaud the adoption of the Delaware approach. But if liability *really* is limited to that which is imposed under the Delaware approach, what is the point of also adopting the RCOD, which ordinarily creates much broader liability than the Delaware approach? It's a little like posting signs for a 55-mph speed limit and then posting signs for an 80-mph speed limit—and then leaving both signs up. If drivers are really free from liability if they stay under 80 mph, why even discuss a more stringent 55-mph limit? At a minimum, that's confusing.

Likewise, I am confused by the majority's adoption of two conflicting regimes here. Why not simply say, "We're adopting the Delaware approach, not the RCOD," and then delete the other pages that discuss the RCOD?

The majority, though, goes beyond merely adopting the RCOD for purposes of *this* case. Instead, the majority says that the RCOD is now "*a rule of interpretation* for [Iowa's] environmental statutes and other public welfare laws that impose strict liability on persons responsible for the statutory violation." (Emphasis added.) Yet I see no prior Iowa case that has adopted the RCOD, much less adopted it as a "rule of interpretation" for any type of Iowa statute. I also notice that only about ten other jurisdictions have adopted the RCOD. And at least some courts in those jurisdictions have described the RCOD as a mere "common law theory of liability." *People v. Roscoe*, 87 Cal. Rptr. 3d 187, 189

(Ct. App. 2008); *accord Celentano v. Rocque,* 923 A.2d 709, 722 (Conn. 2007) ("The responsible corporate officer doctrine is a common-law theory of liability. *See, e.g., United States v. Park*, 421 U.S. 658, 670–73, 95 S. Ct. 1903, 44 L. Ed. 2d 489 (1975)."). United States District Court Judge Mark W. Bennett (ret.), long noted for his scholarship, described the RCOD as "a creation of the common law." *United States v. Quality Egg, LLC*, 99 F. Supp. 3d 920, 924 n.3 (N.D. Iowa 2015), *aff'd sub nom., United States v. DeCoster*, 828 F.3d 626 (8th Cir. 2016).

In any event, consider the implications of this court's adoption of the RCOD as a "rule of interpretation" that governs both "environmental statutes and other public welfare laws that impose strict liability on persons responsible for the statutory violation." We cannot expect regulators to overlook this. Rather, regulators will expect us to approve RCOD personal liability for corporate officers under any statute that can be characterized as a strict-liability "public welfare law." And as for the more-limited Delaware approach, regulators may argue that it is not really a part of the RCOD. Indeed, if you read the Delaware case that the majority and I both rely on, you will find no reference to a "responsible corporate officer *doctrine.*" Regulators may also note that in today's opinion, the majority does not actually say that the Delaware limits are part of the majority's RCOD "rule of interpretation." Rather, the majority merely says that those limits are an "appropriate benchmark for interpreting Iowa Code section 455B.307." Of course, this leaves open future arguments that the Delaware limits are *not* "appropriate benchmark[s]" for RCOD claims under *other* strict-liability "public welfare laws." And so, today's opinion opens the door to full-blown RCOD liability under a broad—or, at least, an undetermined—range of Iowa statutes.

**V. But What's the Big Deal?**

But why, the reader might ask, am I so concerned about the RCOD? My concern is about the vast potential breadth of RCOD liability (and I think that concern is shared by the majority, at least to some degree; otherwise, the majority wouldn't have added in the Delaware approach as *a limiter* on RCOD liability under section 455B.307).

As the State accurately explains: under the traditional view of the RCOD, a corporate officer's personal liability "is not based on an officer's personal participation, or even knowledge of the alleged violations" of a statute. (Citing *Park*, 421 U.S. at 670.) Rather, under the RCOD, an officer's liability flows from their position in the corporation and, of course, the power that comes with that position. That is what the Supreme Court said in *United States v. Park*, a foundational RCOD case. *Id.* at 670–71. What matters, *Park* said, is that "by virtue of the relationship" an officer "b[ears] to the corporation," the officer "*had the power to prevent* the act complained of." *Id.* (emphasis added). And so, because high-ranking corporate officers are theoretically capable of preventing nearly any corporate activity, those officers might be personally liable for any company violation solely because of their position in the company and the power that comes with it. As the State's brief explains: "The responsible corporate officer doctrine *is meant to* apply to high-ranking corporate officers . . . who operate companies that violate public welfare laws. . . . State cases applying the doctrine *routinely* have imposed liability on company officers . . . who *had the ability* to prevent or correct environmental violations *through their corporate roles*, but did not do so." (Emphasis added.)

I respectfully submit that this court should not inject that sort of scheme into Iowa law. *See State v. Markowitz*, 273 A.D.2d 637, 640–42 (N.Y. App. Div.

2000) (declining to impose strict statutory liability on "stockholders or officers of corporations which own or operate the system from which a[n] [oil] spill has occurred based solely on those statuses"). If the RCOD's style of "buck stops here" liability is to threaten high-ranking officers of Iowa corporations—as well as foreign companies, like those before us—the judiciary should not be its creator. Rather, if that sort of change is to come, it should come through a clear mandate from the people's democratically elected policymakers in Iowa's legislature. As the Supreme Court advised in *Meyer v. Holley*, even when a statute advances crucial public interests—such as combatting racial discrimination in housing—courts should not adopt schemes like the RCOD unless the legislature has clearly authorized them. 537 U.S. 280, 287 (2003) (distinguishing *Park*, 421 U.S. at 673, and *United States v. Dotterweich*, 320 U.S. 277, 280–81 (1943), because, in those situations, Congress had specified its intent that officers or agents would be liable for corporate violations); *see* Martin Petrin, *Circumscribing the "Prosecutor's Ticket to Tag the Elite"--A Critique of the Responsible Corporate Officer Doctrine*, 84 Temp. L. Rev. 283, 321 (2012) [hereinafter Petrin] ("In light of the doctrine's singular position within the traditional legal framework and its uneasy fit with corporate law principles, courts should heed the Supreme Court's call in *Meyer* and refrain from extending the duties of a corporate entity to its 'responsible officers' in absence of a clear legislative mandate.").

But I find no clear legislative mandate for the RCOD in the provisions before us. As explained, although the statute allows personal liability for "[a]ny person *who violates*" the prohibition, it does not specify how a *personal* violation is to occur. Iowa Code § 455B.307(3) (emphasis added). Certainly, the statute does not say that if you're a "responsible officer," *every* corporate violation is *your*

violation—whether you were involved in it or not, and whether you knew of it or not. If the legislature had wanted to impose such broad-ranging liability on corporate executives, it certainly could have said so. After all, some *other* legislatures in *other* jurisdictions *have* expressly authorized "responsible corporate officer" liability in certain environmental statutes. For instance, "Congress has amended both the Clean Water Act and the Clean Air Act to include 'any responsible corporate officer[s]' in the definition of 'person[s]' who face criminal penalties under each Act." Petrin, 84 Temp. L. Rev. at 291 (alterations in original) (quoting 33 U.S.C. § 1319(c)(6) (2006); 42 U.S.C. § 7413(c)(6) (2006)). Similarly, the legislatures of California, Connecticut, Hawaii, Indiana, New Jersey, and Wisconsin have all expressly named "responsible corporate officers" (or some synonym) as potentially liable parties under environmental statutes. *See* Cal. Pub. Res. Code §§ 25321(b), 25362(e) (West 2026); Conn. Gen. Stat. § 22a-438(b)–(e) (2026); Haw. Rev. Stat. § 342D-37 (2026); Ind. Code §§ 13-11-2-191(a), 13-12-6-1 (2025); N.J. Stat. Ann. § 58:10A-3(l) (West 2025); Wis. Stat. § 283.91(6) (2025). Yet Iowa's legislature has chosen not to adopt that sort of language.

Of course, as the majority notes, there are courts that have adopted the RCOD without explicit statutory support. *See, e.g., Roscoe*, 87 Cal. Rptr. 3d at 190, 194–95. Yet we would not be the first court to *reject* schemes like the RCOD because of the absence of clear legislative authorization. *Cf. Markowitz*, 273 A.D.2d at 640–42. I've already mentioned *Meyer*, where the Supreme Court opined that "courts ordinarily should determine [corporate agent liability] in accordance with traditional principles of vicarious liability-unless, of course, Congress, better able than courts to weigh the relevant policy considerations, has instructed the courts differently." 537 U.S. at 290–91.

Similarly, in *Asdal Builders, LLC v. New Jersey Department of Environmental Protection*, the court vacated penalties against certain corporate officers "for violations prior to October 2, 2006," the date on which the relevant environmental regulations "added the term 'responsible officer.'" 46 A.3d 575, 584 (N.J. Super. Ct. App. Div. 2012). *Before* that change occurred, the court observed, "the statute did not impose individual liability on responsible corporate officers." *Id.*

Likewise, in *Illinois v. Commonwealth Edison Co.*, the federal district court reasoned that because Congress *had* expressly authorized actions *by a federal agency* against "responsible corporate officers" but *had not* expressly authorized such actions *by private citizens*, it discerned a "clear intent of Congress to exempt individual corporate officers from liability under citizen's suits." 490 F. Supp. 1145, 1147–48 (N.D. Ill. 1980); *accord Illinois v. Celotex Corp.*, 516 F. Supp. 716, 719 (C.D. Ill. 1981).

Also, in *Commissioner of Environmental Protection v. Underpass Auto Parts Co.*, the Connecticut Supreme Court found that because its legislature *had* expressly authorized the RCOD in certain *criminal* Aquifer Protection Act cases *but had not* expressly authorized the doctrine as to *civil* liability, the RCOD *did not apply* to civil Aquifer Protection Act cases. 123 A.3d 1192, 1208 (Conn. 2015).

The same sort of logic should apply here. In some parts of the Iowa Code, our legislature has expressly imposed personal liability on corporate officers for particular corporate wrongs, such as certain sales tax violations. Iowa Code § 423.40(2) (imposing criminal liability on "officers of any corporation" who engage in certain sales tax violations); *cf. id.* § 502.509(7)(*b*) (imposing liability on "[a]n individual" who is an "executive officer . . . of a person liable" for certain securities fraud violations). Likewise, in the environmental statutes at issue here,

our legislature *could have* chosen to expressly adopt the RCOD. But the legislature chose not to. We should not substitute a different choice. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 96 (2012) ("Judicial amendment flatly contradicts democratic self-governance.").

**VI. Conclusion.**

Although I appreciate my colleagues' efforts in this case, I cannot join them in adopting the RCOD. Instead, we should just apply Delaware's much more limited approach and be done. I respectfully concur in the judgment.

McDonald, J., joins this concurrence in the judgment.